**QWEST CORPORATION, Plaintiff,**

v.

**UTAH TELECOMMUNICATION OPEN INFRASTRUCTURE AGENCY, an interlocal cooperative governmental agency, and the City of Riverton, a Utah municipal corporation, Defendants.**

No. 2:05 CV 00471 PGC.

United States District Court, D. Utah, Central Division.

March 7, 2007.

David R. Goodnight (WSBA No. 20286), John H. Ridge (WSBA No. 31885), Loren G. Armstrong (WSBA No. 33068), Stoel Rives LLP, Seattle, WA, Admitted Pro Hac Vice.

Gregory B. Monson (USB No. 02294), Stoel Rives LLP, Salt Lake City, for Plaintiff Qwest Corporation.

## STIPULATED JUDGMENT AND AGREED JUDGMENT OF DISMISSAL

CASSELL, District Judge.

1. *Parties.*

    a.  Plaintiff Qwest Corporation ("Qwest") is a Colorado corporation providing wholesale and retail telecommunications services in fourteen states. It filed this action on June 1,

2005, and appeared through its attorneys, Stoel Rives LLP.

b. Defendant the Utah Telecommunication Open Infrastructure Agency ("UTOPIA") is an interlocal governmental entity created by fourteen Utah municipalities under the Utah Interlocal Cooperation Act to construct and operate a wholesale telecommunications network. Defendant appeared through its attorney Steven W. Allred and David J. Shaw.

2. *Claims.* Although Qwest and UTOPIA at various times had multiple claims and counterclaims against each other, the only claims remaining in the action relate to allegations by Qwest that UTOPIA enjoys various advantages and preferences as a result of its relationship with its member cities and its status as an interlocal entity which Qwest claims (a) violate 47 U.S.C. § 253 of the Telecommunications Act of 1996 ("Section 253") and (b) violate the Municipal Cable Television and Public Telecommunications Services Act (the "Utah Municipal Telecom Act"), including U.C.A. § 10–18–303.

3. *Qwest's Allegations.* The various advantages and preferences alleged by Qwest include the following:

- Qwest claims that between 2002 and early 2004, UTOPIA's Member Cities loaned UTOPIA more than $1,000,000. Approximately $686,351 of that was repaid in late 2004 without any interest. The remainder has not been repaid.
- From November 2002 through June 2003, a Member City made a loan to UTOPIA, wherein the city paid the salary of an executive administrative assistant working for UTOPIA and paid an additional amount for equipment. In approximately June 2004, UTOPIA reimbursed the city for these expenses, but without paying any amount for interest.
- From 2002 through 2004, a Member City employed and paid the salary and benefits of Paul Morris who was its city attorney. However, during that period, he was also working for UTOPIA. In approximately August 2004. UTOPIA reimbursed the Member City $120,000 for

these services. The amount paid was not based on any records supporting the time spent or services performed by Mr. Morris for UTOPIA and included no amount for interest.

- Numerous Member Cities have loaned personnel to UTOPIA to work for UTOPIA while they were employed and paid by the Member Cities. UTOPIA has not repaid these Member Cities any amount whatsoever for the use of these personnel. These personnel include, but are not limited to:

  - A Member City's city attorney served as UTOPIA general counsel from May 2002 through August 2004;
  - A Member City's treasurer served as UTOPIA's treasurer in 2002;
  - Another Member City's treasurer provided accounting services to UTOPIA from 2002 through 2003; and
  - Numerous employees of various cities have provided advisory services to UTOPIA on numerous occasions.

- Even though UTOPIA estimated its accounting services would cost approximately $70,000 in FYE 2005, a Member City agreed to provide an extensive list of services, and to maintain staff that are capable of providing these services whether or not the city required such individuals for its own needs, for a monthly payment of $2,000 from UTOPIA.

- Although many of UTOPIA's Member Cities have ordinances requiring all telecommunications service providers to (a) apply for a franchise, (b) pay an application fee, and (c) post an irrevocable letter of credit or a bond prior to such an application, these Member Cities have not applied this requirement to UTOPIA and UTOPIA's retail service providers, because of a requirement UTOPIA's Member Cities agreed to in the First Amended and Restated Interlocal Cooperative Agreement of UTOPIA.

- Qwest claims that several of UTOPIA's Member Cities have entered into preferential lease purchase agreements with

UTOPIA for the Member City's existing telecommunications facilities. Qwest claims that these agreements provide UTOPIA (a) exclusive use of the facilities; (b) long-term financing that does not include any interest; (c) a purchase price that may not reflect the actual fair-market value of the system; and (d) several years of free, exclusive access to existing facilities.

- At least one UTOPIA Member City has paid a private developer to install facilities in new subdivisions, and then sold those facilities to UTOPIA at the City's cost, without any interest, and on terms that allow UTOPIA to exercise its purchase at any time within the next five years. Qwest contends that for other service providers to provide similar services, they must install the facilities as part of an "overbuild" which Qwest claims is much more expensive.

- Other UTOPIA Member Cities have an ordinance requiring developers to install conduit in new developments at the developer's cost and to dedicate such facilities to the city for its exclusive use. Qwest claims that UTOPIA's Member Cities are also contractually obligated to then dedicate such facilities to UTOPIA for its exclusive use. Qwest contends for other service providers to provide similar services, they must install the facilities as part of an "overbuild," which Qwest claims is much more expensive.

- UTOPIA's Member Cities have a contractual obligation to approve UTOPIA's construction permits.

- Qwest claims that UTOPIA's Member Cities have at various times promoted, advertised and lobbied for or on behalf of UTOPIA.

4. *UTOPIA's Responses to Qwest's Allegations.* UTOPIA denies the advantages and preferences alleged by Qwest under paragraph 3 and has defended as follows:

- UTOPIA has received no monetary loans from any Member Cities. Rather, all monies received by UTOPIA from member Cities were paid in exchange for services rendered and in accord with the Utah Interlocal Cooperation Act. UTOPIA claims that the Act specifically permits the shared use of personnel about which Qwest complains. In any event, UTOPIA claims such transactions took place prior to the passage of S.B. 66 and the limitations contained therein which Qwest alleges prohibit such transaction.

- UTOPIA contends that it owed no interest on the various transactions set forth in paragraph 3, above.

- Qwest testified that it had no methodology that would allow it to acquire data, analyze data, and make an evaluation as to the extent that UTOPIA's entry into the marketplace has affected Qwest's service

- Qwest stated that it has not conducted, and does not intend to conduct, any report analysis or other review regarding the effect of UTOPIA's entry into the marketplace.

- As part of their extensive due diligence to determine whether or not to continue their participation in UTOPIA, between 2002 and early 2004, UTOPIA's Member Cities advanced funds to UTOPIA to conduct preliminary assessments and feasibility studies and provide operational funds for the early stages of UTOPIA. UTOPIA hired a third-party consultant to conduct such preliminary assessments and feasibility studies. Such funds were paid for actual and valuable services rendered which provided an economic development and information tool to the Member Cities regardless of membership in UTOPIA. Pursuant to UTOPIA's founding organizational documents UTOPIA reimbursed the monies paid by the pledging Member Cities with bond proceeds. UTOPIA claims that it had no obligation to repay the funds to any Member City that opted not to continue as a member of UTOPIA.

- UTOPIA claims that as expressly authorized by the Interlocal Cooperation Act, several Member Cities authorized employees to provide services to UTOPIA to minimize UTOPIA's investigational and start-up costs and to minimize taxpayer risk. UTOPIA claims that, un-

der the Interlocal Cooperation Act, it was not obligated to pay for such services, however, UTOPIA paid, or tendered payment to, Member Cities for the salary of an executive administrative assistant, and for services rendered by UTOPIA's Executive Director and General Counsel. UTOPIA has repaid its loan from a Member City for equipment.

- UTOPIA entered into a written agreement with a Member City for the provision of accounting services. The agreement was negotiated at arms length and obligated UTOPIA to pay the Member City's reasonable estimate of its actual, fully-loaded (salary, benefits and associated overhead) costs to provide the accounting services.

- As part of the Member Cities' due diligence regarding their participation in UTOPIA, UTOPIA was subjected to greater scrutiny than cities in the State of Utah typically apply to telecommunications companies seeking franchise agreements. As a result of such scrutiny, under Section 10.2 of UTOPIA's First Amended and Restated Interlocal Cooperation Agreement ("UTOPIA Interlocal Agreement"), the Member Cities have granted to UTOPIA and its service providers a franchise agreement under the same requirements "applicable to any existing franchise providing the same telecommunications service." Qwest does not have a telecommunications franchise in eleven of UTOPIA fourteen Member Cities and has taken the position that such franchises are not required by law.

- Qwest takes the position that franchise agreements are no longer necessary in the state of Utah.

- Qwest supported House Bill 149 in the 2001 Utah Legislative Session and Senate Bill 66 in the 2004 Utah Legislative Session, both of which established the legal framework under which municipal telecommunications could legally proceed in Utah, including requirements for public hearings, which are not applicable to private telecommunications providers. UTOPIA claims that the legal framework established by both bills contains stricter processes than any telecommunications franchise ordinance of the Member Cities.

- UTOPIA negotiated with its Member Cities and other parties for the lease, purchase, and use of existing infrastructure assets to lower the cost of network construction and reduce taxpayer risk. Such agreements were negotiated at arms length and reflected fair market value with objective, reasonable terms, which included the time value of money and reasonable risk allocation.

- Qwest has taken the position that it must install its facilities as part of a more expensive "overbuild" instead of entering into transactions to lease, purchase and use existing infrastructure assets as is UTOPIA's practice. UTOPIA claims that only Qwest corporate policies and decisions prohibit Qwest from negotiating for the lease, purchase and use of existing infrastructure assets to lower its own cost of construction and either lower customer pricing or increase shareholder rate of return.

- There are no Member Cities that require developers to install conduit and dedicate it to the Member City for purposes of facilitating the connection of the new development to UTOPIA's network. The few Member Cities that may require dedication of conduit have consistently represented that the conduit is available for use by any communications system, including Qwest, upon negotiation of reasonable terms and conditions with such Member City.

- Pursuant to Section 10.3 of the UTOPIA Interlocal Agreement, UTOPIA is entitled to receive excavation permits from a Member City upon first abiding by that Member City's ordinances. Every company seeking to excavate within a Member City, including Qwest, is similarly entitled to receive excavation permits upon first abiding by that Member City's ordinances.

- UTOPIA Member Cities have at times communicated with their constituents regarding the progress of UTOPIA's

construction to ensure that taxpayers remain fully informed but have not advertised UTOPIA services.

- One Member City testified that Qwest has never paid certain permitting fees. Such failure to pay has resulted in special fee waivers of hundreds of thousands of dollars to Qwest.

- UTOPIA has invited, and continues to invite, Qwest to use UTOPIA's network. To the extent Qwest perceives any advantages unique to UTOPIA's network, Qwest can avail itself of such advantages.

- UTOPIA contends that Qwest's corporate decision not to use UTOPIA's network, rather than any behavior by UTOPIA or its Member Cities or the relationship between the same, prevents Qwest from availing itself of any perceived advantages to UTOPIA.

- Except as otherwise protected by the Utah Government Records Access and Management Act, U.C.A. §§ 63–2–101 *et seq.*, UTOPIA's records are public.

- UTOPIA conducts its meetings pursuant to the Utah Open and Public Meetings Act, U.C.A. §§ 52–4–101 *et seq.*

5. *Denial of Violation of Statutes.* UTOPIA denies that its actions, its relationships with its member cities, and its status as an interlocal cooperative agency violate any provision of Section 253 or the Utah Municipal Telecom Act, and that they are expressly permitted by the Utah Interlocal Cooperation Act, Utah Code 11–13–101 *et seq.*

6. *Stipulation.* Without admitting any liability, Qwest and UTOPIA (collectively, the "Parties") now desire to amicably resolve all existing and potential claims arising out of or related to the facts giving rise to the remaining claims in this action by entering into this Stipulated Judgment as follows:

- On a going-forward basis:

  - *Loans From Member Cities.* If UTOPIA borrows money from a Member City, such funds shall be repaid to its Member Cities with interest based on the then-applicable rate established by the Utah State Public Treasurer's Investment Fund, and such loan and re-

payment terms shall be memorialized in a publicly-disclosed agreement.

- *Salary and Personnel Loans.* If UTOPIA enters into an agreement with a Member City for salary loans or personnel loans of Member City employees to work for or on behalf of UTOPIA while employed and compensated by the Member City, such arrangements shall be governed by a publicly-disclosed written agreement which includes payment of an amount that represents the Member City's fully loaded costs of such employees, including salary, benefits, and all associated overhead costs. This requirement shall not be interpreted as precluding Member City employees, representatives, officers, and officials from serving on UTOPIA's board or committees at no cost to or reimbursement from UTOPIA.

- *Payment of Fees for Professional Services.* If UTOPIA enters into agreements with Member Cities for the provision of professional services, such arrangements shall be governed by publicly-disclosed written agreements that shall expressly require inclusion of the Member City's fully-loaded costs, including all costs to the Member City of such employees, including salary, benefits, and all associated overhead costs.

- *Franchise Requirements.* To the extent that they are deemed to apply to any Qwest entity by a court of competent jurisdiction, future Member City franchise ordinances, including application requirements, shall apply equally to UTOPIA and its service providers. This does not preclude UTOPIA or its Member Cities, or any service provider, including Qwest, from challenging the legality of or reserving its rights as to such franchise ordinances.

- *Lease/Purchase Agreements.* Where UTOPIA enters into lease/purchase or similar agreements for the purchase, lease or use of existing telecommunications facilities owned by Member Cities, such agreements shall be public

and shall reflect the fair-market value of the Member City's facilities (based on an independent appraisal for facilities estimated at over $500,000), and objective, reasonable terms, which shall include time value of money and risk allocation, as negotiated between the parties to the lease/purchase agreement.

- *Conduit Dedication.* UTOPIA will not accept dedication of conduit from Member Cities.

- *Permitting Requirements.* At a minimum, UTOPIA shall comply with all applicable Member City permitting ordinances in the same manner as Qwest and other service providers.

- *Contract for Payment of Taxes/Fees.* By contract, UTOPIA will require each service provider to pay a Member City any tax, franchise fee, or other charge that would be applicable to the provider if the provider had obtained a separate franchise from that Member.

- *Provision of Services Outside of UTOPIA Boundaries.* UTOPIA shall provide written notice to its Pledging Member Cities prior to entering into an agreement to offer services to any development, project, or customer that is not located within the physical boundary of a Member City, provided however, that this provision shall not be construed as requiring approval from any Member City.

- *Notice Requirement.* UTOPIA will use best efforts to provide at least seven (7) days notice, through publication on its website, in advance of any public meeting or hearing by a City to join UTOPIA as a Non–Pledging Member City.

7. *Compliance Requirements.* As required by state law. UTOPIA shall, at its own expense and at the end of each fiscal year, hire an independent auditor. A report, to be issued by the auditor, shall be made publicly available. UTOPIA agrees to provide a copy of this Stipulated Judgment to the auditor for its use and consideration in such audit. The auditor shall be required to include in its report any finding of noncompliance with this Stipulated Judgment.

8. *Continuing Jurisdiction of Court.* The Parties expressly agree and acknowledge that the Court shall retain jurisdiction over the Parties relating to compliance with this Stipulated Judgment, including, but not limited to, enforcement through the Court's contempt power.

9. *Self–Executing Agreement.* This Stipulated Judgment will be self-executing on March 1, 2007 and shall be entered by the Court on that date, unless either Party notifies Magistrate Judge Nuffer, in writing by close of business on or before March 1, 2007, that the Stipulated Judgment should not be entered.

10. *Qwest Dismissal.* Upon execution of this Stipulated Judgment by the Court on March 1, 2007, all of Qwest's remaining claims in this action will hereby be dismissed with prejudice. This dismissal of these claims shall bar Qwest from filing these or any substantially similar claims against any Member Cities based on the conduct alleged in this action.

11. *Mutual Release.* Upon execution of this Stipulated Judgment by the Court on March 1, 2007, the Parties hereby release, acquit and forever discharge each other and their respective past, present, and future principals, officers, directors, employees, and their respective successors in interest, insurers and attorneys from: any and all actions including but not limited to, causes of action, claims or demands for damages or other relief, attorneys' fees, costs, loss of profits, expenses, compensation, consequential damages, or any other thing whatsoever, known or unknown, based on, arising out of, resulting from, or in any way related to the Lawsuit.

12. *Applicable Law.* This Stipulated Judgment shall be governed by and construed in accordance with the laws of the State of Utah.

13. *Comprehension of Document, Joint Preparation.* In entering into this Stipulated Judgment, the Parties represent that they have relied upon the legal advice of their attorneys, who are the attorneys of

their choice. Preparation of this Stipulated Judgment has been a joint effort of the Parties, and the resulting document shall not be construed more strictly against one of the Parties, than against the other. Any headings used herein are for reference only and shall not affect the construction of the Stipulated Judgment.

14. *Authority.* Each Party executing this Stipulated Judgment represents and warrants that (a) it has full authority to enter into this Stipulated Judgment, and it has obtained all necessary consents and approvals to the extent applicable, and (b) it has not assigned or transferred, or purported to assign or transfer, to any other person or entity any of the claims which are the subject matter of this Stipulated Judgment. The individuals who execute this Stipulated Judgment represent that they have authority to do so on behalf of the entities for which they sign.

15. *Successors and Assignees.* The terms of this Stipulated Judgment shall be binding upon and inure to the benefit of the Parties and their successors and the past and present agents, officers, directors, employees, representatives, shareholders, insurers and assigns of each with respect to all claims and causes of action described herein.

16. *Entire Agreement, Amendment.* Except as stated in the Supplemental Settlement and Release Agreement, this Stipulated Judgment contains the entire agreement between the parties with regard to the matters herein set forth and supersedes all prior and contemporaneous negotiations, commitments and agreements with respect to its subject matter. This Stipulated Judgment may be amended or modified only by an agreement in writing executed in the same manner as set forth in this Stipulated Judgment.

17. *Attorneys' Fees and Costs.* Each Party shall bear its own attorneys' fees and costs.